IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

CITY OF LAS CRUCES AND DONA ANA
COUNTY,

      Plaintiff,

vs.                                            Civ. No. 17cv809 JCH/GBW

THE LOFTS AT ALAMEDA, LLC;
AMERICAN LINEN SUPPLY OF NEW
MEXICO, INC.; RAWSON LEASING
LIMITED LIABILITY CO.; and
CHISHOLM'S-VILLAGE PLAZA L.L.C.,

      Defendants.

## MEMORANDUM OPINION AND ORDER OF REFERENCE

This case is before the Court on *Plaintiffs' Motion to Strike American Linen's Expert's Reports and Exclude His Testimony* [Doc. 261]. Plaintiffs argue that both reports of American Linen's expert, James P. Bearzi, should be stricken and that he should be barred from testifying at trial. As grounds for their motion, they contend that Bearzi's initial report should be stricken because it merely parrots hearsay opinions asserted by other experts who will not be testifying at trial. They then argue that Bearzi's second report, styled as a supplemental report, is in reality an untimely rebuttal report. American Linen disputes both arguments. After reviewing the motion, the response [Doc. 280], the reply [Doc. 286], and the evidence submitted by the parties, including the reports in dispute, the Court concludes that the motion should be granted in part, and the matter of how to proceed with American Linen's expert should be referred to the U.S. Magistrate Judge to recommend a remedy that is appropriate in light of the current posture of the case.

## FACTUAL AND PROCEDURAL BACKGROUND

This is a case brought under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601 et seq. At issue in the case is whether American Linen bears some portion of responsibility for perchloroethylene ("PCE") contamination of soil and groundwater at the Griggs and Walnut Groundwater Plume Superfund Site ("the Site") in Las Cruces, New Mexico. The expert at issue in this motion, James Bearzi, is the senior environmental geologist at Glorieta Geoscience, Inc. ("GGI"), *see* Bearzi's 6/3/2019 Report at 5, and he has been retained by American Linen.

Thomas M. Johnson and Jan B. Kool are both hydrogeologists retained by American Linen's former co-defendant, the United States of America. On May 31, 2019, and June 3, 2019, respectively, Johnson and Kool produced their rebuttal reports. *See* Docs. 160 and 161. American Linen's initial expert reports and its rebuttal reports were also due on June 3, 2019. On that date, American Linen provided Plaintiffs with Bearzi's "Preliminary Draft Expert Report" (hereafter, "Bearzi's First Report"). Bearzi's report included his opinions as well as rebuttal to the opinion of Plaintiffs' expert hydrogeologist, Steven Helgen. Bearzi's first report relied very heavily on Johnson's and Kool's earlier reports, though he did not have time to consider their rebuttal reports. The United States has now settled with Plaintiffs, and the Court understands from the briefs that Johnson and Kool, who were not deposed, will not be available to testify at trial.

Plaintiffs' rebuttal expert reports were due on July 15, 2019. Plaintiffs served rebuttal reports from each of their three experts, including Helgen, on that date. The case management order did not provide a deadline for American Linen to serve rebuttals to Plaintiffs' rebuttal reports. However, Rule 26(a)(2)(D)(ii) states that a rebuttal report must be served within 30 days of the

2

report it purports to rebut—in this case, by August 14, 2019. That deadline passed without American Linen serving any further reports.

On August 21, 2019, the case was stayed. Eleven months later, on July 17, 2020, the stay was lifted, and on July 30, 2020, the Court entered the Consent Decree [Doc. 225] between the Plaintiffs and the United States. Then, on August 4, 2020, American Linen served Plaintiffs with a second Bearzi report (hereafter, "Bearzi's Second Report").

In his first report (which was undisputedly timely), Bearzi asserted four opinions: first, that the former Las Cruces East Airport, the Doña Ana County Transportation Department, and the former National Guard Armory were the primary contributors of PCE to the Site; second, that Plaintiff City of Las Cruces' Walnut Street Storage Yard ("WSSY") is a significant contributor to the contamination; third, that the City of Las Cruces Municipal Well CLC-18 is a conduit for PCE contamination to migrate vertically; and fourth, that releases from American Linen and other dry cleaners on Main Street did not contribute to the mass of PCE in the groundwater plume at the Site.

On August 4, 2020, American Linen provided Bearzi's second report, which is titled as a "supplemental" report. In that report, Bearzi includes new and additional discussion of the basis for the first and fourth opinions in his first report.

.

## **LEGAL STANDARD**

Rule 26(a)(2)(B) sets forth the required content of expert reports. This includes, in pertinent part:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them;
> (ii) the facts or data considered by the witness in forming them;

>> (iii) any exhibits that will be used to summarize or support them;

The Rules also direct the timing of expert reports. Under Rule 26(a)(2)(D), "[a] party must make these disclosures at the times and in the sequence that the court orders." In the absence of such an order, the disclosures must be made:

> (i) at least 90 days before the date set for trial or for the case to be ready for trial; or
> (ii) if the evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) or (C), within 30 days after the other party's disclosure.

The Rules provide for supplementation of expert reports under certain circumstances. Under Rule 26(e)(2), the duty to supplement an expert report "extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."

Finally, Rule 37(c)(1) provides for the Court with broad discretion to impose an array of possible sanctions if a party fails to meet its disclosure obligations under Rule 26 and the Court determines that sanctions are appropriate:

> If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:
> (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;
> (B) may inform the jury of the party's failure; and
> (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Rule 703 of the Federal Rules of Evidence governs the admissibility of expert testimony at trial. It provides, in relevant part: "An expert may base an opinion on facts or data in the case that

4

the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted."

## DISCUSSION

I.     **The First Bearzi Report—Rule 703 Arguments**

Plaintiffs argue that the first Bearzi report should be excluded because it relies on the reports of experts Johnson and Kool, both of whom were retained by the United States and neither of whom will testify at trial. According to Plaintiffs, Bearzi's reliance on those reports does not satisfy the foundation requirement of Rule 703 that facts or data must be those reasonably relied upon by experts in a particular field.[1] Plaintiffs contend that the first Bearzi report is "superficial" and lacks substantive independent analysis and that Bearzi is merely repackaging the Johnson and Kool opinions (which have not been subject to cross examination in a deposition) as his own.

Federal Rules of Evidence 702 and 703 permit an expert to rely upon facts or data that is of a type reasonably relied upon by experts in the field. *See* Fed .R. Evid. 702 & 703. Courts around the country have held that the rules do not permit an expert to rely upon opinions developed by another expert for purposes of litigation without independent verification of the underlying expert's work. *See, e.g. Tokio Marine & Fire Ins. Co. v. Norfolk & Western Ry. Co.*, 1999 WL 12931 at *4 (4th Cir. Jan. 14, 1999) (unpublished) ("The hearsay quality of a report may not be cured merely by having another expert testify that he agrees with its conclusions. Wisecup may have been an expert in his own right who could have made his own, independent, assessment of

---

[1] Plaintiffs state that while the current motion is not brought under *Daubert*, they do intend to file a *Daubert* motion if the Court denies the motion currently under review. Neither party has requested a hearing on the current motion.

the values of the cars. However, Clark's hearsay opinion could not be admitted on the basis of Wisecup's statement that he agreed with its conclusions."); *In re Imperial Credit Indus., Inc. Secs. Litig.*, 252 F.Supp.2d 1005, 1012 (C.D. Cal. 2003) (holding that it was improper for an accountant to testify to the information found in an expert report authored by a purported residual valuation expert regarding another litigation); *Fosmire v. Progressive Max Ins. Co.*, 277 F.R.D. 625, 629-30 (W.D. Wash. 2011). Under such circumstances, courts have held the expert's testimony to be inadmissible. *In re Imperial Credit Indus., Inc. Secs. Litig.* at 1013 (citing cases); *see also Alphamed Pharm. Corp. v. Arriva Pharm., Inc.*, 432 F. Supp. 2d 1319, 1356-57 (S.D. Fla. 2006) (holding that expert's reliance on another expert's analysis developed for use in another litigation, in the admitted absence of his own verification of that analysis, was inadmissible).; *Hernandez v. Crown Equip. Corp.*, 92 F. Supp. 3d 1325, 1351 (M.D. Ga. 2015) ("An expert 'may not simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon.'") (quoting *In re Polypropylene Carpet Antitrust Litigation*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000)).

In *Fosmire*, the court excluded an expert's opinions that were based on the data and methodology of a second expert where there was nothing in the record to indicate that the testifying expert had tested the second expert's underlying data to ensure its reliability or that that he even had access to the second expert's underlying data. Similar to the facts here, the second expert in *Fosmire* was not available to testify at trial or available for cross-examination. 277 F.R.D. at 629-30. Likewise, the court in *Carpet Antitrust* excluded an expert's opinion to the extent it relied on conclusions of another expert because the testifying expert failed to demonstrate a valid basis for concluding the report was reliable and showed no familiarity with the methods and reasons underlying the hearsay report. 93 F. Supp. 2d at 1357 ("Particularly when parties do not have the

opportunity to examine the information relied upon, courts must ensure that an expert witness is sufficiently familiar with the reasoning or methodology behind the information to permit cross-examination."). In contrast, the court in *Hernandez* refused to exclude an expert in human factors and warnings, finding that he could reasonably rely on the work done by experts in other fields—engineers and data analysis experts—who were going to be available for cross examination at trial. 92 F. Supp. 3d at 1351.

In this case, the contents of Bearzi's first report demonstrate a lack of independent analysis to support his stated opinions. In Section 5.0 of his first report titled "Bases for Opinions," Bearzi relies extensively upon the reports of two other experts in this case, Thomas Johnson and Jan Kool, who were retained by the United States. In fact, some of his opinions appear to rely almost entirely on their work as well as that of the EPA. True, like Johnson and Kool, Bearzi is educated in geology, and based on the current record the Court does not suggest that he was unable to understand and properly analyze the data and reasoning relied upon by Johnson and Kool. Rather, the Court simply acknowledges that nothing in Bearzi's first report seems to suggest that he undertook that sort of analysis.

With regard to his first opinion (that the airport, transportation department, and armory were the primary contributors of PCE), in a mere two sentences Bearzi summarizes the EPA's conclusions that PCE sources at the Site did not include "contributions from the Main Street area," *e.g.,* American Linen. He then goes one to devote one paragraph each to the airport, the DACTD maintenance facility, and the armory as sources of PCE at the Site. His statements on these topics and brief and conclusory. Regarding the airport, Bearzi states that Kool "accurately and reasonably assessed" its contributions to the Site, without going into any detail. He states that solvents were "likely" used and illegally dumped at the airport, without any citation to data, and therefore it is

"likely" that the airport was one of the primary contributors of PCE. Similarly, with regard to the maintenance facility, Bearzi says that Kool and Johnson "accurately and reasonably assessed" their contributions of PCE to the Site, but again he does not state why he agrees with their assessment or what independent analysis he undertook, if any. Instead he makes some conclusory statements and then opines that the maintenance facility was "one of the primary contributors of contamination." Finally, with regard to the armory, Bearzi agrees in conclusory fashion with the EPA's assessment in its report of investigation ("RI") that the armory was a primary contributor of contamination—again, with no indication that he performed any independent analysis.

Bearzi's first report states that the following forms the basis of his second opinion (that the WSSY was a significant contributor of contamination at the Site):

> The expert report of Kool (2019) accurately and reasonably assessed the contribution of releases from the WSSY to contamination in [the Site]. Although EPA in the [Remedial Investigation] identified the WSSY as only a "potential" source, relatively high PCE concentrations in soil vapor were detected in the northern portion of the WSSY. EPA attributed these detections to lateral migration from other non-WSSY release sites. Kool (2019) disputes this, citing the long distances (well over 100 ft) from other potential release areas, and the sampling port in the onsite monitoring well GWMW-10 in the [upper hydraulic zone] consistently yielding sampling with PCE detections, and most of the exceeding the maximum contaminant level. Kool cites recent studies of the configuration of the low-permeability unit conducted by [John Shomaker & Associates, Inc.] (not reviewed by GGI) that would serve to support the conclusion that WSSY is an additional source, and that detections in lower ports in GWMW-10 are the result of vertical migration of PCE induced by pumping of CLC-27. I concur with Kool's assessment of the WSSY as a source of PCE contamination to [the Site].

The foregoing is the sum total of the stated basis for Bearzi's second opinion. In essence, Bearzi first restates the EPA's conclusion that the WSSY was merely a potential source. Then Bearzi states that Kool disagrees and asserts that he agrees with Kool. There is no indication Bearzi conducted any independent study, analysis, or investigation.

Regarding his third opinion (that municipal well CLC-18 acted as a conduit for PCE migration to groundwater at the Site), Bearzi's report contains two supporting paragraphs. The first appears to be a restatement of opinions by Kool and Johnson. The second paragraph contains no mention of either Johnson or Kool, and it contains a short description of the soil contamination and permeability of the gravel near the well, which he says "creates a direct conduit for flow of PCE-contaminated groundwater." There is too little information here for the Court to determine whether Bearzi conducted an independent analysis, looked at underlying data, or otherwise scrutinized the opinion he embraces.

Finally, Bearzi does include a meatier discussion in support of his fourth opinion, which is that the dry cleaners on Main Street (including American Linen) did not contribute to the mass of PCE at the Site. In his discussion of this topic, Bearzi focuses on rebutting the opinions of Steven Helgen, Plaintiffs' expert hydrogeologist. In that discussion, Bearzi sets forth the ways in which he disagrees with Helgen and the basis of that disagreement. *See, e.g.,* Bearzi's 6/3/2019 Report at 12-15. However, Bearzi does not seem to conduct any independent analysis of Helgen's work; rather, he embraces wholeheartedly Johnson's critique of Helgen's opinions. Bearzi also acknowledges that "many of the documents cited in Johnson's reports were not available" to Bearzi at the time he wrote his first report., which appears to confirm that he performed no independent critique of Johnson's assessment.

The conclusion that Bearzi merely adopted Johnson and Kool's conclusions without performing his own analysis is further supported by Section 6 of his report, which lists the documents he relied upon to form his opinions. Of the seven documents listed, four are reports written by other experts—Johnson, Kool, and Helgen. The remaining three are reports and models generated by the EPA. This is in stark contrast to the dozens of documents, articles, studies, work

9

plans, and site assessments reviewed and relied upon by Johnson and Kool. *See* Docs. 286-1 and 286-2. Accordingly, the only reasonable conclusion based on the current record is that Bearzi's first report is entirely (or almost entirely) an adoption of the work of experts Johnson and Kool, and is therefore not admissible under Rule 703.

**II.     Timeliness of the Second Bearzi Report**

On August 4, 2020, American Linen provided Bearzi's second report, which is titled as a "supplemental" report. In that report, Bearzi includes new and additional discussion of the basis for the first and fourth opinions in his first report. Plaintiffs argue that despite its name, this second report is in fact a rebuttal report and is therefore untimely.

First, the Court agrees that Bearzi's second report is, in fact, a rebuttal report and not a supplemental report. With regard to his first opinion (that the airport, transportation department, and armory were the primary contributors of PCE), Bearzi does not add much information regarding the basis for his opinion that the municipal airport contributed PCE to the Site. However, he greatly expanded the discussion of his opinion that the Doña Ana County Transportation Department and the National Guard Armory are significant contributors, primarily through extensive rebuttal of Helgen's opinions.

With regard to his fourth opinion (that American Linen and other dry cleaners are not a significant source of PCE contamination), Bearzi has significantly expanded the section of the report setting forth his statement of reasons for that opinion. In addition to again embracing Johnson's reasons for disagreeing with Helgen, Bearzi also states that he concurs with Kool's June 3, 2019 Rebuttal Report (provided the same day as the first Bearzi report) as well as Krasnoff on certain issues. Bearzi also expresses his disagreement with Helgen's rebuttal report. Although—

much like in his first report—Bearzi does extensively quote and rely on other experts in discussing the reasons for his opinion, parts of this portion of the second report read as though he has also done some independent research and analysis. However, it is clear that the contents of the second Bearzi report are primarily a rebuttal of Helgen's rebuttal report.

American Linen argues that the second Bearzi report is a supplemental report, not a rebuttal report. The Court disagrees. As American Linen notes, supplementation "means correcting inaccuracies, or filling the interstices of an incomplete report based on information that was not available at the time of the initial disclosure." Doc. 280 at 9 (quoting *Cook v. Rockwell Int'l Corp.*, 580 F. Supp. 2d 1071, 1169 (D. Colo. 2006) (internal citations omitted)). Importantly, American Linen acknowledges that the new information not available at the time of Bearzi's first report was the fact that the United States would settle with Plaintiffs, leaving Johnson and Kool unavailable to testify and provide their own rebuttal to Helgen. Doc. 280 at 10. This type of "new information," which amounts to a change in the procedural posture of the case affecting one's litigation strategy, is not the type that justifies a supplemental expert report. It is unlike, for example, new facts or data on migration of PCE at the Site, or new information regarding illegal dumping activities nearby, that would alter or reinforce the expert's opinion. Thus, American Linen has admitted that it needed Bearzi to provide additional rebuttal to Helgen because Johnson and Kool would not be available to do so. Thus, the second Bearzi report was a rebuttal report.

Having concluded that Bearzi's second report is a rebuttal report and not a supplemental report, the Court turns to the question of timeliness. Under Rule 26(a)(2)(D)(ii), in the absence of a court-ordered deadline, a rebuttal report must be made within 30 days after the other party's disclosure. In this case, the deadline for Bearzi's rebuttal report was August 14, 2019. That deadline passed without American Linen serving any reports. The case was then stayed from

August 21, 2019, until July 17, 2020. American Linen did not serve Plaintiffs with Bearzi's second report until August 4, 2020. Excluding the time the case was stayed, American Linen served Bearzi's second report 24 days after the 30-day deadline. Thus, the second Bearzi report—which is a rebuttal report—was untimely.

### III.     Remedy

Plaintiffs argue that because Bearzi's first report is improper under Rule 703 and because his second report is an untimely rebuttal report, both reports should be stricken and Bearzi should not be permitted to testify at trial. American Linen argues that such a result would be too harsh, as it would effectively rob them of a substantive defense to Plaintiffs' claims.

Since the filing of Plaintiffs' motion to strike, the posture of the case has changed significantly. The complaint has been amended, additional discovery has been conducted, and significant motion practice has taken place. Currently, there is no trial setting. As a result, the Court concludes that the United States Magistrate Judge, who has a clear understanding of the posture of the discovery in this case, is in the best position to recommend a fair and logical course of action regarding American Linen's expert. This could include whether American Linen should be permitted to keep Bearzi as an expert (with certain allowances made for Plaintiffs), whether Bearzi should be prohibited from testifying, whether American Linen should be permitted to identify a different expert, or whether an entirely different course of action not listed here is most appropriate. The Court therefore refers the question of the procedural remedy to the Magistrate Judge, who will then make his report and recommendation to this Court.

**IT IS THEREFORE ORDERED** that *Plaintiffs' Motion to Strike American Linen's Expert's Reports and Exclude His Testimony* [Doc. 261] is **GRANTED IN PART**, and the matter of how to proceed with American Linen's expert is referred to the U.S. Magistrate Judge to recommend a remedy that is appropriate in light of the current posture of the case.

_____
SENIOR UNITED STATES DISTRICT JUDGE